1   EDMUND G. BROWN JR., State Bar No. 37100
    Attorney General of California
2   BARBARA J. SEIDMAN, State Bar No. 137638
    Supervising Deputy Attorney General
3   SUSAN E. SLAGER, State Bar No. 162942
    Deputy Attorney General
4     1300 I Street, Suite 125
      P.O. Box 944255
5     Sacramento, CA 94244-2550
      Telephone:  (916) 322-5471
6     Fax:  (916) 324-5567
      E-mail:  Susan.Slager@doj.ca.gov
7   *Attorneys for Defendants Stan Armoskus,*
    *Norma Acquaviva, Tony Thompson*

8

9                    IN THE UNITED STATES DISTRICT COURT

10                  FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

| | |
|---|---|
| 13 **SHIREEN WRIGLEY,** | 2:10-CV-00703-WBS-EFB |
| 14                                Plaintiff, | **DEFENDANTS' REQUEST FOR** |
| 15        v. | **JUDICIAL NOTICE IN SUPPORT OF SPECIAL MOTION TO STRIKE** |
| 16 | **PLAINTIFF'S DEFAMATION CLAIM IN PLAINTIFF'S FIRST AMENDED** |
| 17 **NORMA AQUAVIVA, in her personal capacity, DOROTHY SWINGLE, in her** | **COMPLAINT** |
| 18 **personal capacity, STAN ARMASKUS, in his personal capacity, MICHAEL D.** | Date:        November 8, 2010 |
| 19 **McDONALD, in his personal capacity, JOHN NEPOMECENO, in his personal** | Time:        2:00 p.m. |
| 20 **capacity, ANTHONY R. THOMPSON, in his personal capacity, the CALIFORNIA** | Courtroom: 5 |
| 21 **DEPARTMENT OF CORRECTIONS AND REHABILITATION, et al.,** | Judge:       The Hon. William B. Shubb |
| 22 | Action Filed:  January 22, 2010 |
| 23                                Defendants. | |

24

25       TO PLAINTIFF AND HER ATTORNEY OF RECORD:

26       Defendants respectfully ask this Court to take judicial notice of the following documents

27   pursuant to Federal Rule of Evidence 201:

28

                                                1

1       1.       The Declaration of Shireen Wrigley filed in Opposition to Defendants' June 18, 2010

2   Anti-SLAPP motion.

3           *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500 (9th Cir. 1986).

4

5       2.       Article 14, section 31140.1, of the California Department of Corrections Operating

6   Manual.

7           *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500 (9th Cir. 1986); *Anderson v. Simon*, 217

8   F.3d 472 (7th Cir. 2000).

9

10      3. Article 14, section 31140.9, of the California Department of Corrections Operating

11  Manual.

12          *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500 (9th Cir. 1986); *Anderson v. Simon*, 217

13  F.3d 472 (7th Cir. 2000).

14  Dated:  September 10, 2010                          Respectfully submitted,

15                                                      EDMUND G. BROWN JR.
                                                        Attorney General of California
16                                                      BARBARA J. SEIDMAN
                                                        Supervising Deputy Attorney General
17

18                                                      */s/ Susan E. Slager*

19

20                                                      SUSAN E. SLAGER
                                                        Deputy Attorney General
21                                                      *Attorneys for Defendants*

22  SA2010100931
    10610033.doc

23

24

25

26

27

28

# Exhibit 1

**UNGERMAN LAW OFFICES**
ELISA W. UNGERMAN (CA STATE BAR NO. 149719)
331 J Street Ste. 200
Sacramento, CA 95814

Telephone:     (916) 447-2484
Fax:            (916) 334-2924
Email:          Ungermanlaw@aol.com

Attorneys for Plaintiff
SHIREEN WRIGLEY

UNTIED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CASE NO. 2:10-CV-00703-WBS-EFB

SHIREEN WRIGLEY, an individual,

Plaintiff,

vs.

NORMA AQUAVIVA, in her personal
capacity; DOROTHY SWINGLE, in her
personal capacity, STAN ARMASKUS, in his
personal capacity, MICHAEL D. MCDONALD,
in his personal capacity, JOHN
NEPOMECENO in his personal capacity,
ANTHONY R. THOMPSON, in his personal
capacity, the CALIFORNIA DEPARTMENT
OF CORRECTIONS AND REHABILITATION
and DOES 1-20.

Defendants.

DECLARATION OF SHIREEN WRIGLEY
IN OPPOSITION TO DEFENDANTS'
ANTI-SLAPP MOTION

Date:          August 30, 2010
Time:          2 pm
Courtroom:      5
Judge:         Hon. Shubb

I, SHIREEN WRIGLEY, declare as follows:

1.      I am the Plaintiff in this matter and have personal knowledge of the following.  If

called to testify, I could testify competently thereto.

2.      In May of 2002, I became licensed in Arizona and Colorado as a nurse

practitioner.  In September 2002, I became board certified as a Nurse Practitioner

by the American Academy of Nurse Practitioners.  I became licensed by the State

1    of California as a Nurse Practitioner in December of 2006. Since receiving these

2    licenses, I have been able to provide patient care services without supervision or

3    direction within the scope of the Nurse Practitioner license in those three states.

4    At all pertinent times relevant to this lawsuit, I was properly licensed as a Nurse

5    Practitioner in California.

6    3.   In January 2007, I was hired and approved by the California Department of

7    Corrections & Rehabilitation (CDCR) through the Registry of Physician

8    Specialties (RPS) via a contract with the Registry as an independent licensed

9    nurse practitioner. In November 2007, I began working in that capacity at High

10   Desert State Prison (HDSP) in Susanville, California.

11   4.   Sometime after I was hired by the CDCR, I was provided with the CDCR's

12   Division of Correctional Health Care Services Health Care Professionals

13   Orientation Manual. I have attached to this declaration as Ex. 1, a true and correct

14   copy of a few pages of that Manual that I have in my custody, control and

15   possession.  It was my understanding that this Orientation Manual contained the

16   Policies and Practices of the "Medical Management System" within CDCR's

17   Division of Correctional Health Care Services (DCHCS). It was in effect during

18   the entire time I worked for CDCR. The Manual specifically states that "The

19   Professional Practices Program" places all "Medical Staff" into one statewide

20   "Medical Staff Organization". "[O]rganized Medical Staff" expressly includes

21   "[b]oth state *and contractor* ...Nurse Practitioners...", so it was my understanding

22   that even though I was a "contractor" nurse practitioner as opposed to a state civil

23   servant, I was part of the DCHCS "organized Medical Staff", subject to oversight

24   by the DCHCS Professional Practices Executive Committee (PPEC) and the

25   Professional Practices Program with regards to disciplining, privileging, as well as

26   credentialing, licensing, etc. The top paragraph on page 32 of the Manual speaks

27   to this, as does the Due Process policy known as "Chapter XXX" attached to Dr.

28   Swingle's declaration. Furthermore, to my knowledge, I was credentialed by the

1    PPEC and given privileges to work at CDCR facilities.

2    5.    My job as a nurse practitioner at CDCR facilities was to provide acute medical

3    care to the inmates, including performing clinical assessments, case management

4    services, constructed and interpreted medical histories, selected and performed

5    certain laboratory tests, implemented treatment plans, and provided referrals to

6    medical specialists and professionals as necessary.  Most of the time, I acted as the

7    "primary care physician" for inmates.  I was considered part of the physician

8    "medical staff " and called "a provider".  I was not a member of the nursing staff

9    of the prison.

10    6.    My first assignment at HDSP included working in the sub-acute facility (CTC).

11    One night in early 2008, while I was on call (very late in the evening), I received a

12    phone call at home from a nurse who stated that she was refusing to give a patient

13    his medication (antibiotics) as ordered because my order was wrong.  I called my

14    supervising physician at the time, Dr. Akua Agyeman, who told me that my order

15    was correct.  She in turn, to my knowledge, discussed this with the nurse at the

16    CTC.  The pharmacist was notified of the nurses' position and also discussed with

17    the nurse the need to give the medication to the patient.  Nonetheless, the nurse

18    did not give the patient the antibiotics.  The next day I had to re-establish blood

19    concentrations of the antibiotic for the patient.  This put patient at risk of renal

20    (kidney) damage.  After the incident, I made a comment at the nurses station that

21    not giving the ordered medication and having to give another loading dose of

22    antibiotics put the patient at risk for renal damage and it seemed pretty stupid to

23    have to go through that process because nurses couldn't or wouldn't follow correct

24    medical orders.  I also made the comment that in most medical settings, the care

25    of the patient comes first.

26    7.    Evidently nursing staff complained about my comments because after the above

27    incident, Dr. Agyeman told me that there was a request from Norma Aquaviva for

28    a "gag order" on me because she "wanted my head on a platter" for making her

Wrigley's Dec. In Opp. To Defs anti-SLAPP Mtn.     Pg. 3

nurses "look stupid." Later, Dr. Swingle, Dr. Agyeman's superior, told me in a "counseling session" that my actions were correct and not to worry because Ms. Aquaviva had no independent authority to fire or hire a provider such as me, because she was the nursing supervisor. Dr. Swingle also stated that sometimes great providers who are successful need to come across in a manner that at times may be harsh, but first and foremost we are patient advocates. Dr. Swingle further told me that I was a great provider. She stated that when two strong women come together someone's feelings seem to get hurt and perhaps Ms. Aquaviva perceived me as a very strong woman. To my current recollection, Dr. Swingle did not make any negative comments to me concerning my communication with others or make any comments to me indicating that my demeanor was "unprofessional" and needed to be changed, or "work with me" to improve my communication. Indeed, the gist of the "counseling session" was the opposite.

8.   In June of 2008 I was moved to C-yard clinic from the CTC. Dr. Swingle told me I was being moved so she was sure she had a strong provider on C-yard as well as to have me "out of sight-out of mind" from Ms. Aquaviva so Ms. Aquaviva would leave me alone.

9.   While I was the provider on C-yard, I was picked by Dr. Swingle to be the representative as the lead provider for the Asthma initiative. This initiative was to make sure all California inmates received correct and consistent care if they were diagnosed with asthma. Dr. Swingle stated to me that I was selected for this appointment over a state employee because I was such a strong provider and I would be representing HDSP as the "champion provider" at statewide meetings. My RN was also picked to participate in the initiative because we were such a good team together.

10.  While I was the provider on C-yard, from July 08 through November 08 Correctional Officer Vicki Berg had a "shift swap" with another Correctional Officer, allowing her to be the C-yard medical escort officer every Thursday and

Friday after 2 pm.  During this time I had no problems working with her nor was there any problems encountered with other staff.  I knew of no complaints regarding me or Ms. Berg.  She then was assigned to a counselor job, and CO McConnell took over the escort position.  To my knowledge, there were no complaints regarding me from anyone after McConnell took over the position until I became aware of the Thompson memo.

11.     In Aquaviva's declaration (Para #8), she states there were previous staff complaints about my "abrasive and unprofessional conduct" as well as personal observations of such conduct.  Yet, at no time was I "written up" regarding any complaints or issues, and until the Thompson memo, I never had any negative documentation regarding my behavior, "abrasive" or otherwise, including from Ms. Aquaviva or Dr. Swingle who certainly knew about documenting disruptive or unacceptable performance and could have done so at any time.  Moreover, I was not verbally informed of any complaints.  The only time I was ever verbally "counseled" regarding any issue concerning me was the one by Swingle set forth in Para 7 above.

12.     To my knowledge, no complaints or negative information was ever provided to the PPEC as is necessary to commence a review for "corrective action" of "medical staff" as set forth in the "Chapter XXX" document attached to Swingle Declaration, which appears to be part of the CDCR's Medical Practices Program.

13.     Dr Swingle in her declaration (Para 13) mentions that the only issue we discussed about medical charting was that I couldn't efficiently complete my charting duties (and was "counseled" about the same).  This is incorrect on two counts.  First, we never discussed that I was inefficient at charting or couldn't efficiently complete my charting, and  I was never "counseled" regarding any inability to efficiently complete my charting duties.   The issue regarding medical charting came up when  I brought to Dr. Swingle's attention the fact that because I was required to see patients up through 4 p.m. daily, it was impossible for me to properly and

adequately see my patients, then properly and adequately complete the charting on the late afternoon patients because Medical Records would come to the C-yard Clinic to collect the charts at 4 p.m. on the dot, daily.  I could not properly document patient care as required by law on those late afternoon patients and at the same time release the charts to Medical Records when they came to the clinic to obtain the charts. Once Medical Records came to the clinic, I was not allowed to keep the charts. Dr. Swingle agreed with my concern and assured me that as the provider, I had the right and the need to properly document my visits with patients and that she would make sure I was given the appropriate time to do so, while still maintaining HIPPA confidentiality.  After I voiced my concerns, it was decided that I would give medical records a list of the chart names that were still in the Clinic at 4 p.m., then I would lock those charts in my office for safekeeping until the next day when Medical Records came for the daily pick up.  On Fridays, I personally would make sure that all of the charts made it back to the main records area so that they wouldn't be in my office all weekend.  This solution appeared to work for everyone and resolved the problem.

14.    Second, in numerous provider meetings, in which both Dr. Swingle and Ms. Aquaviva were in attendance, I commented on the inadequate medical care being delivered to inmates, including but not limited to problems with the medical records system that prevented the required medical care from being delivered to inmate patients.   During those meetings I was told that these issues were being addressed and no further action was required by me unless I wanted to "write up" someone so they had "cause" for action against them individually.  I was encouraged in fact to "write up" Georgia Johas, the supervisor of medical records, since they said they had other complaints against her and they would have a greater "paper trail" for disciplinary action if I documented my concerns.

15.    On the morning of May 6, 2009, when Dr. Swingle reviewed the Thompson memo with me, she told me that it was "pretty weak" but that she wanted me to

write a rebuttal to it. She stated that she didn't feel it was a significant problem, but that I needed to have a rebuttal in writing. She gave me the memo so I could respond to it.

16. The following day, Ms. Aquaviva called me in and told me that Dr. Swingle had no right to give me that memo because it was private between her and Sgt. Thompson as indicated by the "To/From" lines. She also questioned why Berg and her union rep had the memo, and that they had no right to it. She told me I needed to give it back to her so that she could "make it go away." She told me specifically that she planned to "shred" it once I returned it to her.

17. I was present on April 3, 2009, when Correctional Officer Berg met with Associate Warden Armaskus regarding her grievance on the decision not to assign her to medical escort position in C-yard as per her bid/seniority. Armaskus told us he had just that day discovered that Berg and I were domestic partners and repeatedly stated that Berg was not getting the bid because of the no nepotism/fraternization rule that he showed us. This was the first time either of us had seen the rule.   First we indicated we would not be in violation of the rule since we would not be working "in close proximity" since we were not in the same classification. Then we told him that we had names of other people in similar situations, all "straight", who were allowed to work together including but not limited to two individuals in Medical: an officer escort and a nurse, ex-husband and ex-wife, in D-yard clinic. It appeared to use that the rule was only being enforced as to us. We explained that it seemed unfair and discriminatory that the rule was only being enforced as to us, a same sex couple. He replied that wasn't his concern. He further stated that he had no control of the decision and repeated that Vicki wouldn't get the bid due to the rule. CO Berg indicated that she would be pursuing her grievance since it appeared she was being penalized based on her sexual orientation while others were treated more favorably. She did so on/about April 10, 2009, and planned to pursue her grievance as far as she

1    could until I was terminated from my employment.  At that point, she dropped her

2    grievance.

3    18.   I never had any indication that Officer McConnell was upset in any way with me,

4          either personally or with my conduct, after CO Berg failed to get the bid that

5          would have removed McConnell from the coveted position as medical escort in

6          C-yard.  She never said anything to me, and I had no idea that she felt that my

7          actions or conduct were any different after March 23, 2009 than before March 23,

8          2009.  As far as I knew, we had the same working relationship before and after

9          March 23, 2009, and would have said so if asked.  As of April 10, 2009, CO

10         Berg's grievance was in process, running its course.  There was no reason for me

11         to suddenly start being mean, or "unprofessional" to McConnell because such

12         conduct would not aide Berg's grievance; in fact it could or would only hurt it.

13         Moreover, we learned that CO Berg had been denied the medical escort position

14         on/about March 18, 2009, so there was no reason for me to "Suddenly" change my

15         demeanor on March 23, 2009, about a week later.

16   19.   If the conditions in C-yard Clinic were so hostile and unprofessional as the memo

17         makes them out to be, in my experience, the purported hostile and unprofessional

18         conduct would have been dealt with and/or documented immediately in the

19         interest of patient care and not hidden in a private memo written over the course

20         of a month.

21   20.   Prior to my termination, to my knowledge no one did any investigation to

22         determine if the complaints contained within the Thompson memo were true,

23         valid, or were corroborated by others not friends with McConnell.  I was never

24         allowed to do a rebuttal to the Thompson memo, because I was told to return the

25         memo so it could be shredded and the matter ended.

26   21.   I have read the declarations submitted in support of Defendant's anti-SLAPP

27         motion.  According to Thompson, Associate Warden Armaskus told Thompson to

28         write the memo and address it to Aquaviva.  Armaskus was directly involved in

Wrigley's Dec. In Opp. To Defs anti-SLAPP Mtn.    Pg. 8

the Berg grievance and knew CO Berg would continue to grieve the denial of the bid up through the proper channels.  Doing so could have either resulted in negative outcomes to others who had been allowed to violate or ignore the policy, disrupting morale and potentially creating additional problems or issues within the ranks of Custody staff used to ignoring the rule,  or a negative outcome to McConnell, whose mother and brother were both ranking Correctional Officers and had interest in seeing that McConnell remained in the plum position as long as she could or wanted to.  McConnell stood to gain if Officer Berg either did not get or ultimately did not accept the bid for the C-yard medical escort position. She did not have the seniority to be in that position absent special treatment.

22.   Although the Thompson memo is purportedly about my "unprofessional" or "disruptive" conduct creating a hostile work environment, it begins with the nepotism/fraternization rule pertaining to correctional officers that was at issue in the Berg grievance and had nothing to do with the professional conduct of a nurse practitioner or medical provider.  Indeed, the citing of the nepotism/fraternization rule that did not even apply to me in this context appears to me to be wholly out of place and unrelated to the contention that I was engaging in "unprofessional conduct".

23.   According to Ms. Aquaviva, Armaskus gave the memo to her.  At no time did Ms. Aquaviva, Tony Thompson, a good friend of McConnells,  or Associate Warden Armaskus do any investigation to see if what was stated therein was true even though they knew that the source of the complaints was the very person who stood to lose the medical escort position if Berg continued to press and win her grievance, and her reportedly good friends on the nursing staff who were biased against me.  Evidently, it was thought that if I could be eliminated from C-yard for some disciplinary reason, then Berg would no longer be interested in pursuing the medical escort position in C-yard, would remain in the position she was given in lieu of the one she bid on, and would drop her grievance.  This is exactly what

1    occurred after my termination from HDSP.

2    24.    Individually, Associate Warden Armaskus to whom the memo was originally

3           published had no direct authority over me, a medical provider for inmates at

4           HDSP, and was not in my chain of command.  His direct authority was only over

5           custody personnel such as Correctional Officers. Similarly, Ms. Acquaviva had no

6           direct authority over me and was not in my chain of command.  I reported to Chief

7           Physician John Nepomeceno and Chief Medical Officer Dorothy Swingle, in

8           accordance with the CDCR's medical staff organizational charts at HDSP.

9    25.    In his memo, Mr. Thompson refers to me as a "PA", indicating that he thought I

10          was a "physician's assistant".  This means he knew I was a "provider", regardless

11          of whether he got the license wrong.  He states in his declaration that he thought

12          that Ms. Acquaviva had the authority and ability to remove me from my

13          assignment, when I know for a fact that he knew otherwise.  At HDSP, the Health

14          Care Manager (Acquaviva's position) had responsibility and authority over all

15          employees in Medical except for providers according the CDCR's HDSP's

16          Medical staff organizational charts.  The Chief Medical Officer had responsibility

17          and authority over the providers.  I recall seeing an organizational chart indicating

18          this, and I was also told this during my brief orientation when I started at HDSP

19          by existing staff, both Medical and Custody.

20    26.   The Health Care Access Sargent, Mr. Thompson at the time, was the direct

21          supervisor of all clinic correctional officers such as Berg and McConnell. He

22          reported to the Health Care Access Lieutenant who in turn reported to the

23          Associate Warden assigned to Medical, which at the time was Armaskus.  For

24          Thompson to provide the memo directly to Associate Warden Armaskus and not

25          the Health Care Access Lieutenant means he went outside of his own chain of

26          command, at apparently the request of Armaskus.  Based on my experience and

27          understanding, this is a deviation of how these matters would be typically handled

28          as the CDCR tends to be a stickler about reporting up the chain of command.

Wrigley's Dec. In Opp. To Defs anti-SLAPP Mtn.    Pg. 10

27.   Ms. Aquaviva states she personally heard me call nursing staff "stupid". However, I have never stated that nursing staff was or were "stupid", at the top of my lungs or otherwise, and she was not present during the aforementioned event when I commented that it was stupid to have to perform a procedure that put the patient at risk when nurses couldn't or wouldn't follow orders.

28.   While I was employed at HDSP, I had no control over the means by which I provided my services. Stated another way, I was told by my supervisors when to report to work, where I was to work, how many patients to see in a day, how I was supposed to chart and document patient care, how long the patient visits could be, etc. I was to follow the instructions given to me by my supervisors, Dr. Swingle and Dr. Nepomeceno, and before that Dr. Agyeman. CDCR provided me with the tools needed to do my job, including the clinic, furniture, the paper, pens, files, etc. All but my stethoscope. I provided the same nurse practitioner services that a civil servant nurse practitioner provided or would provide to inmates, in the same manner.

29.   I was compensated for my work as a licensed independent nurse practitioner at an hourly rate for all time that I worked at HDSP while working along with facility staff. I was paid in direct correlation to the hours I worked at the prison, including overtime. In order to get paid, I filled out a timesheet recording the hours I worked that was certified by my superiors. I was paid only after my hours were certified/approved by my supervisors and sent to the Registry, and payment was made to the Registry by CDCR.

I declare under Penalty of Perjury under the laws of the State of California that the foregoing is true and correct.

DATED:

_Shireen Wrigley_

Shireen Wrigley

Wrigley's Dec. In Opp. To Defs anti-SLAPP Mtn.   Pg. 11



# HEALTH CARE PROFESSIONALS ORIENTATION MANUAL

California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Peter Farber-Szekrenyi, DR PH
Director

March 2006

# CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

## VISION

We will end the causes and tragic effect of crime, violence, and victimization in our communities through a collaborative effort.

## MISSION

To improve public safety through evidence-based crime prevention and recidivism reduction strategies.

## VALUES

We commit ourselves to principled leadership-a set of core values that guide our behavior.

- *Integrity*-We conduct ourselves professionally, achieving the highest ethical standards.
- *Accountability*-We take responsibility for our actions and the consequences.
- *Justice*-Everyone receives equitable process and fair outcomes.
- *Collaboration*-Everyone supports mutual understanding of ideas, open exploration of our differences, and works constructively and cooperatively with out stakeholders.
- *Employee Well Being*-We foster an environment that supports professional development and personal health.

## MEDICAL MANAGEMENT

### Overview

The Medical Management System provides a variety of programs and systems to assure that the quality of medical care is maintained, providers maintain clinical standards, and the utilization of resources are appropriate.   The Medical Management System consists of the following areas:

### QMAT

One of the components of the Medical Management System is the Quality Management Assessment Team (QMAT).   The QMAT provides an independent assessment of the quality of medical care delivered at each institution.   Individual institution results and identified system-wide trends are reported to the HCM and the DCHCS, via the various program management reports.
Health Care managers.        Division of Correctional Health Care Systems.
The QMAT staff consists of physicians, RNs, and Health Program Specialists working from headquarters.   The QMAT conducts audits and quality assessments of the institutional health care program.   The QMAT provides direct guidance to institutional medical and nursing staff, based upon on-site assessment and evaluation.   At the institution, the QMAT will assess access to care, quality of care, continuity of care, and follow-up care.

The QMAT also provides technical assistance to the institution in developing and implementing corrective action plans. The QMAT is an essential part of the DCHCS strategy to improve the access, quality and continuity of health care services.

### Death Review  (IMSPP&P Volume 1, Chapter 7)

All inmate-patient deaths are reported to the DCHCS and reviewed according to IMSPP&P.

Reporting and review is completed on each inmate-patient death for the following reasons:
- To determine the appropriateness of the health care provided.
- To determine the cause of death.
- To ensure that corrective measures are implemented, where indicated.
- To allow for statistical analysis and research for the purpose of improving the delivery of health care.

### Professional Practices Program

The Professional Practices Program places all Medical Staff into one statewide Medical Staff Organization.   Both State employee and contractor Physicians, Dentists, Podiatrists, Psychologists, Nurse Practitioners, Physician Assistants, Certified Registered Nurse Anesthetists, and Psychiatric Social Workers are members of the organized Medical Staff.   The purpose of the Medical Staff is to organize the activities of qualified clinical practitioners to carry out, in conformity with the Medical Staff Bylaws, the functions delegated to the Medical Staff by the DCHCS.

## Medical Management

The DCHCS Professional Practices Executive Committee (PPEC) is the Medical Executive Committee for this organization. The organized Medical Staff collaborate to promote a uniform standard of inmate-patient care and to offer advice, recommendations, and input to the DCHCS GB through the PPEC. The Medical Staff organization promulgates bylaws, policies and procedures to determine its governance and administrative structures and the processes for carrying out its work, subject to the ultimate authority of the DCHCS GB.

The Professional Practices Program includes Medical Staff Bylaws, Peer Review, Credentialing and Privileging. All Medical Staff members participate in quality performance and peer review activities and other staff functions.

### Credentialing

In an effort to ensure all inmate-patients receive health care services from properly licensed and qualified staff, each clinician goes through a credentialing process. This process includes a query to the National Practitioner Data Base (NPDB) and appropriate licensing boards.

The Medical Staff Bylaws provide for the appropriate credentialing and appointment procedures including competency evaluation for clinical privileges and evidence of adequate continuing medical education as required for continued licensure. The PPEC makes recommendations for the appointment (and reappointment for continued employment) of medical staff members to the DCHCS GB.

For a complete description of the credentialing process and various licensing requirements and documents, including Medical Staff Bylaws, please see your supervisor.

### Utilization Management

The purpose of the UM Program is to enhance the value and quality of care through the appropriate use of Specialty Services, optimal clinical practice, and the use of resources. The UM Program operates under the Specialty Care Program Subcommittee, which is part of the Performance Management System.

Each institution has a UM Nurse. This RN is responsible for the review of clinical referrals for inpatient beds and specialty care services to ensure that referrals are appropriate. The UM Program combines prospective, concurrent, and retrospective reviews to ensure that requested specialty services are medically necessary and are provided at the appropriate level and site of care.

The UM review process begins with a UM Nurse designated as the first level reviewer. The UM Nurse reviews the health care provider pre-admission service requests and length of stays in licensed facilities, as well as requests for selected consultation, diagnostic procedures and outpatient services. The HCM, or designee, is the second level reviewer, reviewing any requests the UM Nurse is unable to approve per program guidelines. The Medical Authorization Review (MAR) Subcommittee is the third level reviewer. The MAR Subcommittee reviews requests for service that the second level reviewer approves which do not meet criteria, and also reviews appeals and complex cases. The fourth and final level of review and appeal is the Health Care Review Committee (HCRC). Refer to the UM Guidelines for a detailed description of the review and appeal processes.

## PRIMARY CARE PROVIDER CLINICAL ADDENDUM

This document describes the expectations that practitioners have of each other as members of the Division of Correctional Health Care Services (DCHCS) Medical Staff. The expectations described below reflect current Medical Staff Bylaws, Policies and Procedures and organizational policies. This document is designed to bring together the most important issues found in those documents and key concepts reflecting our Medical Staff's culture and vision.

Medical Staff leaders will work to improve individual and aggregate Medical Staff performance through non-punitive approaches. Through positive and constructive feedback, each practitioner will be given the opportunity to grow and develop in his or her capability to provide quality inmate-patient health care and valuable contributions to improving healthcare services.

All Medical Staff are expected to work collaboratively toward a common goal of providing accessible, quality health care, and each provider will be required to meet the standards set forth by the Department. When standards and expectations are not met, the Department will, where indicated, address specific provider deficiencies utilizing the processes established by Departmental regulations.

Technical Quality of Care

- Achieve inmate-patient outcomes that consistently meet or exceed generally accepted Medical Staff standards as defined by comparative data, medical literature and results of peer review activities.
- Provide appropriate inmate-patient health care, including the use of evidence-based guidelines/clinical policies developed by DCHCS.
- Promptly and effectively manage an inmate-patient's acute and chronic pain according to accepted standards in the medical literature and DCHCS.Policies and Procedures.

Quality of Service

- Thoroughly evaluate each inmate-patient brought to the medical area before leaving at the conclusion of the scheduled session/work day.
- Order inmate-patient follow-up appointments according to policy or medically appropriate schedules.
- In order to achieve desired outcomes, function as an advocate for your inmate-patients so that they receive ordered and necessary health care services.
- Respond to pages, consultations, and facility staff requests in a timely manner.
- Communicate effectively with other practitioners, health care staff, custody staff, and inmate-patients and, when appropriate, their families.

Clinical Safety/Inmate-Patient Rights

- Participate in the DCHCS efforts and policies to reduce clinical errors through safe inmate-patient health care practices, including following DCHCS Policies and Procedures and guidelines for prevention of nosocomial infections.
- Document inmate-patients' physical limitations or disabilities, necessary accommodative devices, duty/activity restrictions, and housing needs and follow-up as appropriate to ensure institution compliance.

## Primary Care Provider Clinical Addendum

- Document every inmate-patient encounter in the Unit Health Record in a timely and legible manner with all relevant information required by DCHCS Policies and Procedures.
- Ensure that consents for treatment and/or refusals of treatment are appropriately documented as well as the tests or treatments being provided or refused and the risks/benefits of the consent or refusal.
- Respect inmate-patient privacy by not discussing inmate-patient health care information and issues in public settings.
- Discuss end-of-life issues with an inmate-patient when it is appropriate to their condition, including advance directives and inmate-patient, family, and DCHCS support, and honor the inmate-patient's desires unless they are in conflict with Law.

### Resource Utilization

- Strive to provide quality inmate-patient health care that is cost effective by cooperating with efforts to appropriately use valuable health care resources.
- Cooperate with guidelines for appropriate admission, level of care transfer, inmate-patient instructions, and timely discharge to outpatient management and institutional transfers when medically appropriate.

### Productivity

- Report to work on time and complete assigned tasks.
- Participate in assigned on call coverage as required by the DCHCS.

### Peer and Co-Worker Relationships

- Act in a professional, respectful manner at all times to enhance a spirit of cooperation, mutual respect and trust among members of the inmate-patient health care team, including custody staff.
- Refrain from inappropriate behavior including, but not limited to, impulsive, disruptive, sexually harassing or disrespectful behavior, or any documentation in the medical record that does not directly relate to the inmate-patient's clinical status or plan of care, or that is derogatory or inflammatory.
- Address disagreements in a constructive, respectful manner away from inmate-patients or other non-involved staff.

### Citizenship

- Review your individual performance and utilize this information for self-improvement to continuously improve inmate-patient health care.
- Respond in the spirit of continuous improvement when contacted regarding concerns about your inmate-patient care.
- Make positive contributions to the Medical Staff by actively participating in Medical Staff functions and serving on Committees when requested.

In the spirit of early assistance, help to identify issues affecting the physical and mental health of fellow Medical Staff members and cooperate with programs designed to provide assistance.

*Primary Care Provider Clinical Addendum*

## DOCUMENTATION EXPECTATIONS

Clinician encounters are expected to include adequate documentation in the progress note section of the UHR in the SOAPE format. Health care provided by you will be evaluated utilizing QMAT audit tools, which consist of indicators that assess adequacy of history, physical exam, (objective data) appropriateness of assessment and appropriateness of plan. When an inmate-patient submits a request that describes a number of problems it is expected that each problem listed on the request is addressed at least to the extent that the inmate-patient's denial of the persistence of the problem is documented.

<u>Problem List</u>

There is a problem list in the front of the PCP order section of the UHR. The PCP is expected to keep this list current at each visit, by adding new problems that are expected to last at least six months, closing problems that are no longer active, and designating as high risk those inmate-patients meeting the high-risk criteria.

<u>Chronos</u>

The word "chrono" applies to a variety of custody and medical forms that usually identify an inmate-patient's special status. Copies of chronos are frequently carried by inmate-patients on their person. Medical chronos are signed by the health care provider, and may confer special privileges based on a medical condition or be informational, as in the case of lab and TB chronos.

# Exhibit 2

ARTICLE 14
INTERNAL AFFAIRS INVESTIGATIONS

*EFFECTIVE JANUARY 2007*

**31140.1      Policy**
Every allegation of employee misconduct within the California Department of Corrections and Rehabilitation (CDCR or Department) shall be promptly reported, objectively reviewed, and investigated when appropriate.

**31140.2      Purpose**
To ensure allegations of employee misconduct are addressed and investigations are conducted in a fair and consistent manner.

**31140.3      Definitions**

**Allegation Inquiry** - The collection of preliminary information concerning an allegation of employee misconduct necessary to evaluate whether a matter shall be referred to the Central Intake Unit.

**Appointing Power** - The Secretary of the Department.

**Assistant General Counsel (AGC)** – An individual responsible for managing the Employment Advocacy and Prosecution Team (EAPT) in the Department's Office of Legal Affairs (OLA).

**Assistant Secretary, Office of Internal Affairs (OIA)** - An individual responsible for the operation and functions of the OIA.

**Bureau of Independent Review (BIR)** – A unit within the Office of the Inspector General (OIG) responsible for contemporaneous public oversight of the Department's investigative and disciplinary processes.

**Case Management System (CMS)** – An electronic system that allows real-time documentation on investigative case activity and allows various participants within the employee disciplinary process to monitor cases and record key decisions and due dates. The CMS tracks all investigative requests, case acceptance and rejections, and case activity on all Internal Affairs investigations, as well as direct adverse actions that impose penalties without an investigation.

**Central Intake Panel (CIP)** – A collection of stakeholders led by the OIA that ensures all referred allegations of employee misconduct are evaluated consistently and assigned appropriately throughout the Department. Individuals who participate regularly in the CIP include but are not limited to the following: Assistant Secretary, OIA, or designee; Chief Assistant Inspector General (CAIG), BIR, or designee; AGC, EAPT, or designee; assigned Special Agents; and other pertinent Department representatives. The Assistant Secretary, OIA, has the authority to initiate Internal Affairs investigations and is ultimately responsible for the acceptance and rejection of all cases that come before the CIP.

# Exhibit 3

**31140.8      Required Training**

All Internal Affairs investigators shall complete investigation training and be certified as mandated by Penal Code Section 6126.1 and the OIA Investigation Training Requirements. In addition, Internal Affairs investigators shall complete advanced investigative training as outlined in the OIA Investigation Training Requirements.

**31140.9      Filing an Allegation of Employee Misconduct with a Hiring Authority**

Information regarding alleged employee misconduct shall be reported promptly by staff to a supervisor or other appropriate departmental, governmental, or law enforcement entity. If information is reported verbally to a supervisor, the staff person shall also submit a written report to the supervisor.   The supervisor shall prepare a separate written report regarding the allegation(s) and shall submit his/her report and the staff person's report to the Hiring Authority or to the Hiring Authority's supervisor if the allegation(s) are against the Hiring Authority.  Such reports shall include all pertinent information concerning the allegation(s), the timeline, and the source(s) of the information.

Any allegation of misconduct which is believed by staff to constitute an emergency shall be reported immediately to a supervisor, locally designated investigators, or the OIA.  In the event of such an emergency, staff shall follow-up with the written report within one (1) day of learning of the information.  Some instances that constitute an emergency are as follows:

- Possible loss of life or serious bodily injury;
- Serious breach of facility security;
- Further aggravation of a potentially dangerous situation;
- Activities which seriously compromise or jeopardize an investigation;
- An illegal activity which may occur imminently.

**31140.10      Reporting Misconduct and Protecting Employees from Retaliation**

To encourage and protect employees that confront and report serious misconduct, the Department has strengthened its policies and procedures to provide additional protections beyond those included in the California Whistleblower Protection Act (Government Code section 8547 et seq.) and other California protective statutes.  This reporting of misconduct process and the protection offered by the Department are detailed in the Department's "Policy and Procedure for Reporting Serious Misconduct and Protecting Employees from Retaliation." The procedures may be obtained by contacting the OIA.

**31140.11      Inmate, Ward, or Parolee Complaints Against Staff**

All inmate, ward, or parolee complaints against staff shall be processed in accordance with DOM, Section 54100.

**31140.12      Complaints by Members of the Public Against Department Employees**

Pursuant to Penal Code Section 832.5, it is the policy of the Department, as an employer of peace officers, to have a procedure for investigating a complaint by a member of the public against its peace officers.